UNITED STATES of America, Plaintiff,

v.

John GILBERT, Defendant.

No. 93–CR–80221–DT.

United States District Court,
E.D. Michigan, S.D.

Aug. 16, 1993.

Amy Hartman, Asst. U.S. Atty., Detroit, MI, for plaintiff.

Craig A. Daly, Detroit, MI, for defendant.

*OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE*

ZATKOFF, District Judge.

## I.  INTRODUCTION

This matter is before this Court on defendant John Gilbert's ("defendant Gilbert") motion of July 20, 1993, to suppress certain evidence in this criminal action.[1] Defendant Gilbert has been charged with conspiracy to possess with intent to distribute and distribution of a controlled substance, in violation of 21 U.S.C. §§ 846 & 841(a)(1) and with pos-

session with intent to distribute Marijuana, in violation of 21 U.S.C. § 841(a)(1). The government filed a response in opposition to defendant Gilbert's motion. On Tuesday, August 10, 1993, this Court held an evidentiary hearing on defendant Gilbert's motion to suppress. For the reasons set forth below, defendant Gilbert's motion to suppress will be DENIED.

## II.  BACKGROUND

As noted above, this Court held an evidentiary hearing in this matter on August 10, 1993. During this hearing, this Court had an opportunity to consider, and did consider, each witness's ability and opportunity to observe the facts and the events to which he or she testified; each witness's memory and manner while testifying; each witness's interest, bias, or prejudice; and the reasonableness of each witness's testimony considered in light of all the evidence admitted for the purpose of the hearing. Based upon the testimony produced during the hearing, the evidence which this Court received, and the briefs which the parties have submitted, this Court makes the following factual findings for the purpose of defendant Gilbert's motion to suppress.[2]

Between 6:00 and 6:30 a.m., on the morning of March 3, 1993, approximately 10–12 agents from the Drug Enforcement Administration ("DEA"), the United States Border Patrol, and law enforcement officers from the Blackmon Police Department and the Michigan State Police, arrived at 137 Park Drive, Jackson, Michigan. This was, and still is, defendant Gilbert's residence. The agents went to defendant Gilbert's residence in order to effectuate a federal arrest warrant for defendant Gilbert.

Defendant Gilbert testified that until February 1993, he had been employed with the Michigan Department of Corrections, as a Corrections Officer, at the Cotton Facility in Jackson, Michigan, for approximately 7½ years. The Cotton Facility is a medium

---

**1.** The evidence includes (1) a photo album; (2) miscellaneous paper work; (3) a personal phone book; and (4) a paperback book entitled "Agents: Pipeline."

**2.** Pursuant to *United States v. Cooke,* 915 F.2d 250, 252 (6th Cir.1990), when the testimony of different witnesses differs in material detail, this Court will indicate why it is crediting one witness's testimony over the others.

security prison. Defendant Gilbert also testified, in response to this Court questioning, that in June 1977, he received his general associates degree from Lansing Community College. Defendant Gilbert presently is unemployed.

Barry Smith ("Agent Smith") is one of the case agents in this investigation. Agent Smith is a Special Agent with the DEA and has been so employed for approximately 5 years. All the witnesses described defendant Gilbert's residence in the following manner. The front of the residence contains a small front porch ("front porch"). One must enter the front porch in order to reach the door which leads into the home itself. For the purpose of this Opinion, the door which leads into the porch will be referred to as the "outer door." The door which leads into the house itself will be referred to as the "inner door."

The outer door was an aluminum door which had a glass storm window in place. Next to the outer door was a window. There was also a working door bell adjacent to the outer door. The inner door was a wooden door, which contained three small windows. The distance between the outer door and the inner door was approximately 4 to 5 feet. Upon entering the inner door, one comes into the living room area. Adjacent to the inner door was the door which led into the bedroom in which defendant Gilbert and his wife were sleeping.

Agent Smith testified that on the morning of March 3, 1993, he and 4 or 5 other agents approached the front of defendant Gilbert's residence. Agent Smith then knocked on the outer door and announced "Police—We have a warrant." Agent Smith then waited approximately 20 seconds, and after hearing no response, he and Agent Mark Hall[3] ("Agent Hall") attempted to gain entry onto the front porch. To do so, Agent Hall broke the window in the outer door, along with a window that was next to the outer door.

Agent Smith then came upon the inner door and again knocked and stated "Police— We have a warrant." After waiting approximately 10 seconds, an unidentified agent,[4] used a battering ram to knock the inner door off of its frame and the inner door fell straight to the floor. Agent Smith then stated again that it was the police and that they had an arrest warrant at which point Agent Smith heard defendant Gilbert respond "O.K."[5] Agent Smith also testified on cross-examination that the circumstances suggested neither that a person was attempting to escape nor that evidence was being destroyed.

Agent Smith, along with 3 to 5 other agents, entered the bedroom in which defendant Gilbert and his wife were located. After making sure that the male occupant in the bed was defendant Gilbert, Agent Smith ordered defendant Gilbert to get face down on the floor with his hands behind his back. Defendant Gilbert was naked. Agent Hall handcuffed defendant Gilbert. Penny Gilbert was allowed to remain in bed with the sheets completely covering her. While defendant Gilbert was being handcuffed, the agents conducted a protective sweep of the house. Once the house and defendant Gilbert were secured, all agents holstered their guns. Agent Smith testified that the agents

3. *Agent Hall is with the United States Border Patrol, but was assigned to the DEA at this point in time.*

4. At the hearing, Agent Smith testified that he thought this agent was Agent Hall, but he could not say for certain.

5. Defendant Gilbert and Penny Gilbert, defendant's wife, both testified that the first thing they heard was the inner door being broken down, and that they never heard anyone knocking on either door or announcing that it was the police with a warrant. Penny Gilbert further testified that approximately six months prior to this incident, police had come to the house at approxi-

mately 1:00 a.m., rang the door bell, and that the door bell had awoke her. This Court finds that defendant Gilbert's and Penny Gilbert's testimony should be discredited. On cross-examination it was brought out that both the glass in the outer door and an adjacent window were broken by the agents. Indeed, defense counsel introduced a photograph of the broken glass which lay on the porch floor. Based on the proximity of the outer door and the bedroom in which defendant Gilbert and his wife were sleeping, this Court concludes that the testimony that neither defendant Gilbert nor his wife heard the glass being broken is not credible.

had their guns drawn for approximately 1–2 minutes.

Additionally, when the agents entered defendant's residence, their guns were drawn and pointed at defendant Gilbert. Furthermore, there were no lights on in the house when the agents entered and the agents shined flashlights on defendant Gilbert in order to identify him.

After defendant Gilbert was handcuffed he was allowed to dress and then he was removed to the living area where he was placed in a chair. Only Agent Smith and Agent Hall were with defendant Gilbert in the living room. Penny Gilbert never left the bed. A female agent was with Penny Gilbert at all times. Once defendant was in the chair in the living room, Agent Smith read defendant his *Miranda* rights from a card. Defendant Gilbert said he understood his rights. At this point in time, Agent Smith asked if defendant Gilbert would consent to a search of the residence, including the attached garage and the automobiles. Defendant orally agreed. Agent Smith then read, word by word, a Consent to Search Form to defendant Gilbert. Defendant Gilbert signed the Consent to Search Form.[6] Defendant signed the Consent to Search Form approximately 5 minutes after the agents had entered the home.[7] At this point in time, all of the agents had holstered their guns and no guns were pointed at defendant Gilbert. At no time did defendant Gilbert indicate to an

agent that he did not understand the Consent to Search Form. However, at no time was defendant Gilbert advised that he had a right to refuse the agent's request to search the residence.

After the Consent to Search Form was signed, a trained narcotics dog was brought into the house to sniff for drugs.[8] Defendant Gilbert testified that he had no fear that the dog was going to attack him. In defendant Gilbert's opinion, the dog was well behaved.

### III. DISCUSSION

#### A. KNOCK AND ANNOUNCE STATUTE

18 U.S.C. § 3109 provides that:

The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

First, while § 3109 reads as if it only applies to search warrants, "[t]here is no doubt that this statute's requirements (although applicable in terms only to search warrants) apply to forcible entry to a home when officers seek to make an arrest of a person either on arrest warrant or on probable cause." *United States v. Murrie*, 534 F.2d 695, 697 (6th Cir.1976) (citations omit-

---

**6.** The Consent to Search Form stated that the "RESIDENCE (HOUSE, GARAGE)" of "137 PARK DR., JACKSON, MI. 49203 AND VEHICLES," could be searched. In addition, across the top of the form is states *"CONSENT TO SEARCH."*

**7.** Again, defendant Gilbert and Penny Gilbert both testified differently than Agent Smith. As to Penny Gilbert, she stated that she did not hear anybody: (1) read defendant Gilbert his *Miranda* rights; (2) ask defendant Gilbert to consent to the search; and (3) did not hear defendant Gilbert actually consent to the search. Based on Penny Gilbert's testimony that she did not hear the glass in the outer door being broken or the adjacent window being broken, her testimony that she also did not hear her husband being read his *Miranda* rights or him consenting to the search, is not persuasive and deserves little weight.

With respect to defendant Gilbert, he testified that the agents started to search the house before

he had even signed the Consent to Search Form. In addition, defendant Gilbert stated that he was never read his *Miranda* rights and that he neither read the Consent to Search Form nor was it read to him. He further testified that he only signed it, without looking at it, because he was instructed to do so. In addition, defendant Gilbert indicated that he thought he was signing something pertaining to his *Miranda* rights. This Court finds that defendant Gilbert's testimony not credible, in light of the fact that defendant Gilbert had 7½ years of experience as a correctional officer and was well aware of the importance of records.

**8.** For the reasons contained elsewhere in this Opinion, this Court does not find defendant Gilbert's testimony and his wife's testimony that the dog was brought in before the Consent to Search Form was signed to be credible.

ted). Second, based on this Court's factual findings, as set forth above in this Opinion, this Court holds that the agents effectuating the arrest warrant for defendant Gilbert did satisfy § 3109's requirement that they state their authority and purpose, when Agent Smith stated, at least three times, that it was the "Police—We have a warrant."

Defendant Gilbert also argues that the entry still was not lawful, because the agents were neither denied admittance nor were there exigent circumstances which would otherwise justify the forced entry. This Court agrees with defendant Gilbert that there were no exigent circumstances that could justify the entry. Agent Smith testified that the circumstances did not lead him to believe that someone was trying to escape or that evidence was being destroyed. *Cf. United States v. Nabors,* 901 F.2d 1351, 1354–55 (6th Cir.1990). Thus, the question becomes whether the agents were denied admittance into defendant Gilbert's home. While neither party briefed this precise issue, this Court's research reveals that the Sixth Circuit has yet to address this issue in any detail.[9]

The Seventh Circuit in *United States v. Leichtnam,* 948 F.2d 370 (1991), addressed a situation with facts that are very similar to those in the case before this Court. The facts in *Leichtnam,* as summarized by that court, were as follows:

> Five ... police officers, carrying a federal search warrant, arrived at the duplex where Daniel Leichtnam was living at six a.m. on October 4, 1990. They tried the screen door on the front porch and, finding it locked, knocked and announced themselves, calling out "Police" in a voice slightly louder than might be used in conversation. They heard no sounds and saw no lights inside, and after 15 seconds they forced the screen door with a crow bar and then walked across the porch to the front door. They knocked there three times, again called out "Police" at the same vol-

ume, and waited for a response. Still there was none, and after 20 or 30 seconds more the lead officer gave the go-ahead and a two-man battering ram smashed through the front door. All of this, from the arrival at the screen door to the ram through the locked front door, took more than a minute but less than two.

*Id.* at 372.

In affirming the district court's holding that this constituted refused admittance, the *Leichtnam* Court stated that:

> The magistrate also found that the police waited twenty to thirty seconds after knocking on the front door before ramming through it. That, however, was more than a minute after the officers had first knocked on the screen door and long enough, given the racket five officers must have made prying open the screen door and marching across the porch, for them to conclude that they'd been refused admittance.... Everyone in Leichtnam's house was apparently aware that the police had been standing outside knocking and wanted in; they were simply ignoring the officers. Though no one inside made any sound or movement to indicate his or her presence or to find out what the police wanted, they had all been awakened, and two of them were out of bed and standing up when the police came in.

*Id.* at 374 (citation omitted).

The court in *Leichtnam* cited with approval *United States v. DeLutis,* 722 F.2d 902 (1st Cir.1983), wherein the First Circuit held that "a wait of 20 seconds is deemed adequate before the officers may force entry." *Id.* at 909 (citing *Jackson v. United States,* 354 F.2d 980, 982 (1st Cir.1965) (10 seconds); *United States v. Davis,* 617 F.2d 677, 695 (D.C.Cir.1979), *cert. denied,* 445 U.S. 967, 100 S.Ct. 1659, 64 L.Ed.2d 244 (1980) (15–30 seconds); *United States v. Phelps,* 490 F.2d 644 (9th Cir.), *cert. denied,* 419 U.S. 836, 95 S.Ct. 64, 42 L.Ed.2d 63 (1974) (10–12 sec-

---

**9.** In *United States v. Tellis,* 538 F.2d 1254 (6th Cir.1983) (per curiam), the Sixth Circuit did hold that where police officers executing a search warrant announced their purpose and authority and waited an appreciable time before forcing entrance into the premises to be searched, that

this did not violate § 3109. However, this per curium opinion did not contain any facts relating to how long the police officers had waited and what circumstances the warrant was being executed. Therefore, *Tellis* provides no guidance on the issue of refused admittance.

onds); *United States v. Allende*, 486 F.2d 1351, 1353 (9th Cir.1973), *cert. denied*, 416 U.S. 958, 94 S.Ct. 1973, 40 L.Ed.2d 308 (1974) (10 seconds)). In addition, the United States Court of Appeals for the District of Columbia has concluded that "the phrase refused admittance is not restricted to an affirmative refusal ... but encompasses circumstances that constitute constructive or reasonably inferred refusal.... In making such judgments, courts employ a highly contextual analysis, examining all the circumstances of the case, to determine whether the record establishes the existence of a constructive refusal." *United States v. Bonner*, 874 F.2d 822, 824 (citations omitted) (internal quotation marks omitted).

Here, this Court has found that the agents waited 20 seconds after knocking on the outer door, then smashed the glass in the outer door, as well as in the adjoining window, to gain access to the porch. Thereafter, the agents knocked on the inner door, waited 10 seconds and then used the battering ram to smash through the inner door. Taking all of this into account, the agents waited more than thirty seconds, but probably less than one minute. In addition, there was no sound coming from within the house, even after the agents had broken the glass in the outer door. Based on the facts in this case, and the law cited above, this Court finds that a constructive refusal occurred, and thus the agents were refused admittance. Therefore, no violation of § 3109 occurred. Accordingly, defendant Gilbert's motion to suppress based on his contention that the agents violated 18 U.S.C. § 3109 is DENIED.

## B. DEFENDANT GILBERT'S CONSENT TO THE SEARCH

■ The government bears the burden of proving that defendant Gilbert's consent to the search of his residence was voluntary:

and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent.

*Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854 (1973). In addition, defendant Gilbert's consent "must be proven by clear and positive testimony...." *United States v. Garcia*, 866 F.2d 147, 150 (6th Cir.1989) (citations omitted). Finally, in examining whether the consent was voluntary, the test this Court must employ is whether defendant Gilbert's "will has been overborne and his capacity for self-determination critically impaired." *Schneckloth*, 412 U.S. at 225, 93 S.Ct. at 2047.

■ First, it is important to note that after the agents had arrested defendant Gilbert and completed a protective sweep of the house, all guns were holstered. Defendant Gilbert testified that when he signed the Consent to Search Form that no guns were pointed at him. Additionally, only Agent Smith and Agent Hall were around defendant Gilbert when he signed the Consent to Search Form. Moreover, it cannot be understated that defendant Gilbert had 7½ years experience as a corrections officer at a medium security prison. Based on these facts, this Court finds that there was no threat of force used to secure defendant Gilbert's consent to a search of his residence. *Cf. United States v. Jones*, 641 F.2d 425, 429 (6th Cir. 1981) (finding consent was involuntarily given). In addition, there is no evidence to suggest that the agents used threats regarding adverse consequences which might occur if defendant Gilbert refused to consent.

■ Second, the fact that defendant Gilbert was in custody when he consented to the search is not enough, by itself, to make the consent involuntary. *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) (holding that suspect in police custody could voluntarily consent to a search, inasmuch as under the totality of the circumstances test, custody, standing alone, was insufficient to indicate that consent was coerced). Likewise, the fact that defendant Gilbert was not advised that he had a right to refuse the agent's request to do a search, standing alone, is insufficient to find that defendant Gilbert's consent was not voluntarily obtained. *Schneckloth, supra*. It is

only one factor this Court must examine. *Id.* However, because defendant Gilbert was not informed of his right to refuse to have his house searched, this factor weighs in favor of finding his consent was coerced. *Id.*

Next, in light of this Court's finding that Agent Smith read the Consent to Search Form to defendant Gilbert, after Agent Smith had given defendant Gilbert his *Miranda* rights and defendant Gilbert had affirmatively stated that he understood these rights, this Court concludes that the consent was not obtained by any fraudulent means. That is, defendant Gilbert knew what he was signing was a Consent to Search Form.

Finally, as noted above, and counseling heavily in favor of finding a voluntary consent in this case, is that fact that defendant Gilbert is a college educated person and was employed as a correctional officer at a medium security prison for 7½ years. These personal traits of defendant Gilbert weigh heavily in favor of finding that defendant Gilbert's will was not overborne and his capacity for self-determination critically impaired. *Schneckloth, supra.*

After carefully examining the totality of the circumstances, this Court holds that the government has proven by clear and positive evidence that defendant Gilbert's consent to the search of his residence and vehicles was voluntarily obtained. In addition, while neither party raised the issue, this Court nonetheless holds that, because defendant Gilbert lived in this house, he had the authority to consent to the search. *See, e.g., United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

## IV. CONCLUSION

For all of the aforementioned reasons, defendant Gilbert's motion to suppress evidence is DENIED.

IT IS SO ORDERED.