**UNITED STATES of America, Plaintiff,**

v.

**Walter Wimb HARDEMAN, Defendant.**

No. 98–50025.

United States District Court,
E.D. Michigan,
Southern Division.

Jan. 25, 1999.

Saul A. Green, United States Attorney, by James Mitchell, Asst. U.S. Atty., Flint, MI, for Plaintiff.

Wallace Capel, Federal Defenders Office, Flint, MI, for Defendant.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

GADOLA, District Judge.

Presently before the Court is defendant Walter Wimb Hardeman's motion to suppress evidence filed on October 26, 1998. The government filed its answer and brief in response on November 9, 1998. Defendant has not filed a reply brief. Defendant seeks to exclude statements, the shotgun, handguns and ammunition found by officers of the Flint Police Department after their entry into defendant's residence absent a warrant. The government has conceded that it will not seek to introduce any evidence obtained subsequent to Mr. Hardeman's arrest, to wit: the two handguns and ammunition. The crucial issue in dispute between the parties is whether in fact defendant consented to the entry of the officers into his residence at approximately 7:00 p.m. on December 6, 1997. An evidentiary hearing was conducted on December 8, 1998, and continued on December 21, 1998.

For the reasons set forth below, this Court will grant defendant's motion to suppress.

## I. FACTUAL BACKGROUND

According to police reports, on December 6, 1997, at approximately 5:30 p.m., two uniformed Flint police officers in a marked patrol car observed Cedric Hardeman leave defendant's house, located at 6681 Webster, Flint, Michigan. Officer Meyer, one of the officers on patrol, claimed to have information from other officers and a confidential informant that defendant Hardeman, i.e. Walter Hardeman, was living at 6681 Web-

ster, and was trafficking in cocaine. Officer Meyer was aware, according to reports, that defendant had been convicted of a drug felony charge in the past.

After exiting the residence, Cedric Hardeman entered the passenger side of a burgundy Chevrolet Corsica, driven by one Johnny Jackson. The officers subsequently confirmed by radio that this vehicle possessed a "wanted" status, meaning that although there was not enough probable cause to file a stolen vehicle report, if sighted the vehicle was to be stopped, the occupants identified, and information passed on to the officer investigating the case. *See* Defendant's Brief in Support of Motion to Suppress, p. 2. The officers tailed the vehicle and then attempted to pull it over. A high speed chase ensued, which resulted in a minor traffic accident, and subsequently a foot chase. Jackson, the driver, was arrested approximately one block from the abandoned Corsica. A police tracking dog led to the discovery of a cellular telephone and $2,101 in cash, and Cedric Hardeman hiding under a large, fallen tree.

Cedric Hardeman was arrested on two outstanding misdemeanor warrants charging reckless driving and transporting liquor. Cedric Hardeman eventually claimed ownership of the $2,101 in cash, as well as an additional $1,541 found on his person. Subsequent to the arrests of Cedric Hardeman and Jackson, Sgt. Blough, Officer Meyer, along with four other Flint police officers "went to 6681 Webster Road to further investigate possible drug activity at that location." *See* Government's Brief in Support of Response to Defendant's Motion, p. 2. Sgt. Blough was dressed in plain clothes, while Officer Meyer was in uniform, and no guns were drawn at the time of the initial entry.

The parties are in complete disagreement concerning the events surrounding the officers' initial entry into the residence. As the testimony described below will show, the government claims that Sgt. Blough and Officer Meyer stood on the porch of the residence and knocked on the door, while the remaining officers stayed behind in the yard. The government maintains that the door was answered by a Black male, later identified as defendant Walter Hardeman. Sgt. Blough

then allegedly identified himself as a Flint police officer, investigating the arrests of two subjects who had left the residence earlier in the evening. At this point Sgt. Blough purportedly asked Mr. Hardeman if he could speak to him inside the residence, whereupon defendant turned around and walked back into the home. According to the government, at this point only Sgt. Blough and Officer Meyer entered the residence, the remaining officers remaining outside.

Upon entering the residence, Sgt. Blough reports that he observed five additional subjects, including: Derrick Alfonzo Weatherspoon, Ramona Anderson, Laraina Winfrey, as well as two male juveniles. Both parties agree that Sgt. Blough then asked if there were any drugs or weapons in the residence, whereupon defendant replied, "Yes, I have a shotgun in the closet." Defendant thereafter willingly led Officer Purcell, who had by that time entered the residence, to the southeast bedroom in order to retrieve the firearm. In the southeast bedroom closet, defendant showed the officer a Stevens 12–gauge shotgun, Model No. 820B, with no serial number. Officer Purcell checked the weapon to make sure it was unloaded, and then returned with the shotgun and defendant to the living room.

After returning to the living room, Officer Meyer asked defendant if he was a convicted felon. Defendant allegedly replied, "Yeah, I was convicted of a felony." Sgt. Blough then attempted to obtain Hardeman's consent to search the remainder of the house. Defendant Hardeman refused his consent for this search, and was placed under arrest on two outstanding misdemeanor warrants and for being a convicted felon in possession of a firearm, and was removed from the premises.

As to the time frame surrounding the events which transpired subsequent to defendant's arrest, there is considerable disagreement. Nevertheless, it is clear that Sgt. Blough then attempted to obtain a search warrant to search the remainder of defendant's home by contacting a Genesee county assistant prosecuting attorney. Blough testified that he went outside the residence and used his car phone to call the prosecutor in the hope that he could obtain a search war-

rant for the home. Thereafter, the sergeant left the scene to meet with the prosecutor downtown in an attempt to secure the warrant. The assistant prosecuting attorney, after being advised of the relevant circumstances, refused to seek a warrant for a search of defendant's residence. It may reasonably be inferred that the assistant prosecuting attorney concluded that there was not a sufficient legal basis upon which to seek a warrant for a search of defendant's home. Nevertheless, despite the lack of a search warrant and the prosecutor's decision to decline to seek a search warrant, police officers remaining at the scene proceeded to search the living room and bedroom. Sgt. Blough could not give an accurate estimation of the time which expired between the time he left for the meeting with prosecutor and the subsequent search. As a result of the post-arrest search, two handguns and ammunition were found. *Id.* The government has wisely conceded that these items will not be introduced into evidence, and defendant has not been charged with any crime in connection with these items.[1]

Since the parties are in dispute regarding the facts surrounding the officers' initial entry into defendant's residence, the Court will set forth the essential testimony of government witnesses Sgt. Mark Blough and Officer William Meyer. Thereafter, defendant's version of events will be summarized hereinbelow through a review of the testimony of defendant's witnesses, Ramona Anderson, Laraina Winfrey, and Derrick Alfonso Weatherspoon.

## A. THE GOVERNMENT'S WITNESSES

### 1. TESTIMONY OF SGT. MARK BLOUGH

According to Sgt. Mark Blough, upon arrival at defendant's residence, the sergeant and Officer Meyer went to the porch of the house and knocked on the door. Sgt. Blough was not in uniform. However, Officer Meyer was in uniform, and neither had guns drawn. The other officers did not enter onto the porch area at this point, and were dressed in

uniform. After knocking on the door, Sgt. Blough testified that "[t]he door was opened by a subject [defendant Hardeman] and I talked with him." Transcript of December 21, 1998 Hearing, p. 6. Sgt. Blough further stated that he proceeded to advise Mr. Hardeman that he and Officer Meyer were police officers, investigating "a couple subjects that had been stopped leaving the house. And I asked to talk to him inside the house." *Id.* at 7. The following dialogue reflects Sgt. Blough's recollection of the crucial events impacting upon the consent issue:

Q: And upon asking to come into the house, what happened next?

A: Mr. Hardeman left the door opened and he walked back into the living room.

Q: All right. And did you take that as an indication to *enter?*

A: Yes, I did.

\* \* \* \* \* \*

THE COURT: And he made no vocal response to your request [to enter], is that what you are saying?

A: That's right.

THE COURT: You say he turned and walked away inside the house leaving the door open?

A: Yeah, like you would when you answer the door and walk back into the house, somebody follow you in.

\* \* \* \* \* \*

Q: What did he do—how many steps back into the house did he take, approximately?

A: Maybe four or five.

*Id.* at 7–8.

After Sgt. Blough and Officer Meyer entered the house, defendant was questioned by the sergeant as to whether there were any drugs or guns in the house. Both defendant and the government agree that Mr. Hardeman then replied that he had a shotgun, located in the closet of his bedroom. Sgt. Blough instructed Officer Purcell to go with defendant to retrieve the shotgun. According to Sgt. Blough's testimony, Officer Purcell and defendant returned with the

---

1. See discussion regarding the illegality of this    subsequent search set forth in Part II, *infra.*

shotgun shortly thereafter, during which time Sgt. Blough remained in the living room, speaking with the other individuals there. *See id.* at 10.

Sgt. Blough further testified that after returning with the shotgun, defendant Hardeman again left the living room, accompanied by Officer Meyer, for the purpose of "check[ing] the rest of the house [to] make sure there wasn't anybody else in the house." *Id.* at 11. Upon returning again to the living room with Officer Meyer, Sgt. Blough at this point asked Mr. Hardeman if the officers could search the house for any other drugs or weapons. Defendant then refused to consent to any further search, whereupon defendant was placed under arrest.[2] *See id.* at 11–12.

## 2. TESTIMONY OF OFFICER MARK MEYER

Although Officer Meyer's testimony largely supports Sgt. Blough's version of events, there is an important difference between the two accounts. Concerning Sgt. Blough's initial knocking on the door, Officer Meyer concurs that only he and the sergeant were on the porch at that time. Meyer testified that the sergeant then "asked Mr. Hardeman if we could come into the house and speak with him." Transcript of December 8, 1998 Hearing, p. 25. After Sgt. Blough asked whether they could enter the residence, Officer Meyer testified that defendant then "stated that we could enter the house ." *Id.* This testimony directly conflicts with Sgt. Blough's testimony that Hardeman had made *no vocal response* to the sergeant's request to enter the home, but instead turned and walked away from police and back into the residence. *See* Transcript of December 21, 1998 Hearing, pp. 7–8.

## B. DEFENDANT'S WITNESSES

## 1. TESTIMONY OF RAMONA ANDERSON

Defendant's first witness was Ramona Anderson, defendant's girlfriend, who also resides at the residence in question, 6681

Webster, Flint, Michigan. Ms. Anderson's testimony flatly contradicts the accounts of Sgt. Blough and Officer Meyer. According to Ms. Anderson, the police entered without knocking or speaking first to defendant Hardeman. *See* Transcript of December 8, 1998 Hearing, pp. 9–12. As Ms. Anderson's testimony reflects:

Q: . . .[W]hen the police came up to the house did someone greet them or let them in or what happened?

A: No. They entered on [their] own.

\* \* \* \* \* \*

A: I was on my way to walk out the door and I opened it out and they grabbes it and came on in.

\* \* \* \* \* \*

Q: All right. And when you went to go out, what happened?

A: They opened—they grabbed the handle from the outside.

Q: [When] you said they. Who is they?

A: . . . one of the cops.

Q: All right. So one of the police officers opened the handle?

A: Yes.

\* \* \* \* \* \*

Q: . . . So when you pushed or opened the door . . . to swing it open to go outside, the officer grabbed the handle of that door and pulled it further open?

A: Yes.

\* \* \* \* \* \*

Q: Did you invite them in?

A: No.

Q: Did they ask to come in?

A: No.

*Id.* Ramona Anderson further testified that when the police entered, they approached defendant Hardeman, who was standing behind her at that point in time, "between the living room and the dining room." *Id.* at 12. Defendant allegedly had been working on assembling a bunk bed. *Id.* at 13. The remainder of Ms. Anderson's testimony is

---

2. Defendant was arrested and charged in a one count indictment with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). *See* Indictment filed May 20, 1998.

consistent with the account provided by the government's witnesses.

## 2. TESTIMONY OF LARAINA WINFREY

Defendant's second witness was Laraina Winfrey, a friend of Hardeman who was present during the night in question. Ms. Winfrey testified that she has no criminal record whatsoever, and that she had been acquainted with Hardeman for six years through her son's father. *See id.* at 36. As to the crucial circumstances surrounding the officers' entry into the residence, Ms. Winfrey's testimony wholly supports Ms. Anderson's version of events quoted above. As Laraina Winfrey testified,

Q: . . . Did there come a time when the Flint Police Department came by the house?

A: Yes. They came by the house when we were getting ready to walk out of the house.

\* \* \* \* \* \*

A: Well, we all got up and said that we [were] getting ready to leave. . . getting ready to go out to the movies or whatever. We were all getting ready to approach the door and as we approached the door Ramona [Anderson] grabbed for the door and the door opened and the police walked in.

Q: They walked inside?

A: Yes.

Q: Where was Mr. Hardeman at the time when they walked inside?

A: He was like still in the dining room walking towards the front door also.

Q: Did he have any conversations with them inviting them in? Or was any conversation made with them when they first walked. . . into the room?

A: No, no.

*Id.* at 38–39. Ms. Winfrey's further testimony confirms that defendant told police that there was a shotgun in the bedroom closet. *Id.* at 39. The witness could not remember if defendant's statement regarding the shotgun

was spontaneous, or instead was made in response to a specific question from police. *Id.* at 40.

## 3. TESTIMONY OF DERRICK ALFONSO WEATHERSPOON

The last witness called by defendant was Derrick Alfonso Weatherspoon, also present at defendant's residence on December 6, 1997. Mr. Weatherspoon was unable to provide any details as to how exactly the officers entered the home. Significantly, however, the witness's testimony did reinforce Laraina Winfrey's version of events with respect to the location of defendant Hardeman at the time entry was made:

A: I can't say how they [the police officers] entered, but I was coming from out of the kitchen getting a beer.

Q: Okay. And they were already in the house at the time when you came out of the kitchen?

A: Yes, sir.

Q: . . . Where was Ramona [Anderson] at the time when they were inside?

A: Standing by the front door.

Q: And where was Walter [Hardeman]?

A: He was in back of me.

Q: He was in back of you?

A: Uh-huh.

\* \* \* \* \* \*

Q: All right. And so he was still in the dining room at the time when they had entered into the home?

A: That's where he was putting up the bed frame at.

Id. at 50–51.

## II. ANALYSIS

The Fourth Amendment protects individuals against unreasonable searches and seizures by governmental agents, guaranteeing the right of the people "to be secure in their persons, houses, papers, and effects." U.S. CONST. AMEND. IV.[3] The Fourth

---

3. The Fourth Amendment provides in full as follows:

The right of the people to be secure in their persons, houses, papers, and effects, against

unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the

Amendment is made applicable to the states via the Fourteenth Amendment's due process clause. *See Terry v. Ohio,* 392 U.S. 1, 8, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In applying the Amendment, courts have carved out special protection for an individual's home, such that warrantless entry by governmental actors will be considered *presumptively unreasonable. See Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *see also Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

In *Payton,* the United States Supreme Court considered the constitutionality of New York state statutes, authorizing police officers to enter a private residence without a warrant in order to make a routine felony arrest. *See* 445 U.S. at 573, 100 S.Ct. 1371. In deciding the issue, the Court reiterated the long held view that " 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " *Id.* at 585, 100 S.Ct. 1371 (citing *United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972)). In striking down the unconstitutional statutes, the Court relied upon the following rationale:

> [t]o be arrested in the home involves not only the invasion attendant to all arrests but also an invasion of the sanctity of the home. This is simply too substantial an invasion to allow without a warrant, at least in the absence of exigent circumstances, even when it is accomplished under statutory authority and when probable cause is clearly present.

*Id.* at 588–89 n. 28, 100 S.Ct. 1371 (quoting *United States v. Reed,* 572 F.2d 412, 423, *cert. denied, sub nom. Goldsmith v. United States,* 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978)(internal quotes omitted)). Additionally, the Supreme Court distinguished searches and seizures occurring inside a home from those conducted in public: "[i]t is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 586, 100 S.Ct. 1371.

▮▮ This presumption of unreasonableness may be rebutted, however, by a showing that a specific exception to the warrant requirement applies in the particular case under consideration. *See, e.g., Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). An exception to the warrant requirement may exist where exigent circumstances are found or where the suspect gives his voluntary consent to conduct the search.[4] However, the instant case does not involve any exigent circumstances, and the government does not attempt to justify the search on this ground.[5] Accordingly, the sole issue to be decided is whether defendant gave his voluntary consent to the officers' entry into his residence on December 6, 1997.

▮ The burden is placed squarely on the government to show that consent to search was voluntarily given. *See Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968)(holding that prosecutor who seeks to rely upon consent to justify lawfulness of a search has burden of proving that consent was, in fact, freely and

---

place to be searched, and the persons or things to be seized.
U.S. CONST. AMEND. IV.

4. In *Illinois v. Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990), the Supreme Court reasoned that

> the prohibition [against warrantless entry into a home] does not apply...to situations in which voluntary consent has been obtained, either from the individual whose property is searched, *see Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), or from a third party who possesses common authority over the premises, [*see United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974).]

5. Defendant's argument attacking the warrantless entry and subsequent search of his residence rests in part upon the contention that no "exigent circumstances" existed to justify the search. The Court agrees that the exigency, attendant to the pursuit of Cedric Hardeman and Jackson earlier in the evening, had passed and could no longer be relied upon by the government to justify a warrantless entry into defendant's home. The two suspects were already in custody, and there is nothing in the record to indicate that evanescent evidence in danger of imminent destruction would be found in the residence. *See Ker v. California,* 374 U.S. 23, 39–40, 83 S.Ct. 1623, 1632–33, 10 L.Ed.2d 726 (1963).

voluntarily given). In *Schneckloth v. Busta-monte*, the Supreme Court dealt with the precise issue of what the prosecution must prove in order to demonstrate that consent to search was voluntarily given by a suspect. 412 U.S. at 223, 93 S.Ct. 2041. The Supreme Court held that

> the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent. As with police questioning, two competing concerns must be accommodated in determining the meaning of a 'voluntary' consent—the legitimate need for such searches and the equally important requirement of assuring the absence of coercion.

*Id.* at 227, 93 S.Ct. 2041. The *Schneckloth* totality of circumstances test requires the Court to determine whether defendant Hardeman's consent, if given at all, was voluntary, and not the product of "duress or coercion, express or implied." *Id.* Furthermore, defendant Hardeman's consent " 'must be proven by clear and positive testimony. . . .' " *U.S. v. Gilbert*, 829 F.Supp. 900, 905 (E.D.Mich.1993)(Zatkoff, J.)(quoting *U.S. v. Garcia*, 866 F.2d 147, 150 (6th Cir.1989)). Lastly, in evaluating the voluntariness issue, this Court must determine whether defendant's " 'will has been overborne and his capacity for self-determination critically impaired.' " *Id.* (quoting *Schneckloth*, 412 U.S. at 255, 93 S.Ct. 2041); *see also U.S. v. Miller*, 933 F.Supp. 501, 505 (M.D.N.C.1996)(holding that "[t]o admit evidence obtained from a search of a residence without a warrant, where it is also contended that consent was given, the following factors must be present: (1)[t]here must be a clear and positive testimony that consent was unequivocal and specific and freely given; and (2)[t]he government must prove consent was given without duress or coercion, express or implied").

As demonstrated by the witnesses' testimony at the suppression hearing, the United States and defendant are in sharp disagreement over whether Hardeman ever consented to the entry of the police officers into his residence. Assuming for the moment that the Court accepts the government's contention that Hardeman answered the door after Sgt. Blough's initial knock, it still must be determined whether in fact defendant voluntarily consented, either impliedly or otherwise, to the warrantless entry. According to the government, Hardeman permitted the officers to enter the residence, although Sgt. Blough is unable to point to any specific statement made by defendant articulating his consent. In fact, Sgt. Blough testified that defendant made no statement whatsoever to the officers indicating his consent to the warrantless search of his residence, but rather that defendant turned his back on the officers and walked into the interior of the home. Officer Meyer, on the other hand, testified that defendant orally consented to the entry of the officers, but this is contrary to the testimony of every other witness, whether for the government or for the defense.

Whether the action of defendant in turning his back on the officers and walking into the interior of the house qualifies as "voluntary consent" must be determined by examining the totality of circumstances, discussed below.

In the case at bar, the police officers employed the so-called "knock and talk" procedure. Courts have defined this tactic as "a noncustodial procedure [in which] the officer identifies himself and asks to talk to the home occupant and then eventually requests permission to search the residence." *Miller*, 933 F.Supp. at 505 (citing *United States v. Cruz*, 838 F.Supp. 535, 537 (D.Utah 1993)). This strategy is generally upheld as a legitimate method of investigation, designed to obtain a suspect's consent to search. *See id.*; *see also State v. Betcher*, 1992 WL 231657, at *1 (Minn.App. Sept.22, 1992) (holding that there is no constitutional problem in the abstract with knock and talk consent search); *State v. Green*, 598 So.2d 624 (La.App. 3rd Cir.1992) (holding that knock and talk search is not unlawful); *State v. Land*, 106 Or.App. 131, 806 P.2d 1156 (1991) (knock and talk

search upheld based on consent). However, courts may consider the use of the "knock and talk" procedure as one of the circumstances in evaluating whether consent was given and, if so, whether consent was given voluntarily. *See id.; see also United States v. Tobin*, 923 F.2d 1506, 1509 (11th Cir.1991), *reh'g denied*, 935 F.2d 1297 (1991), *cert. denied*, 502 U.S. 907, 112 S.Ct. 299, 116 L.Ed.2d 243 (1991).

In its attempt to justify the "knock and talk" procedure, as employed in the instant case, the government cites *U.S. v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), for the proposition that the Fourth Amendment does not prohibit police officers from approaching a citizen for initial questioning. In addition, the Supreme Court has held that the purpose of the Fourth Amendment is "to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals," and not to eliminate all contact between police and the citizenry. *U.S. v. Martinez–Fuerte*, 428 U.S. 543, 554, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); *see also Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

■ Despite the important decisions of *Mendenhall* (upholding search of defendant's person in airport), *Martinez–Fuerte* (upholding searches at border patrol checkpoints) and *Terry* (affirming the legitimacy of a "stop and frisk"), all cited by the government, this Court is especially cognizant of the fact that the instant case involves a request for entry into a person's home. Since a person naturally has a greater expectation of privacy in his home than in his vehicle or in public, the Court must closely scrutinize any warrantless search of a residence, and carefully examine any purported consent for signs of coercion or duress.

In a case presenting a similar factual scenario to the instant case, *United States v. Shaibu*, 920 F.2d 1423 (9th Cir.1990), the Ninth Circuit ruled that the government failed to prove that defendant consented to a search of his apartment. In *Shaibu*, police officers went to defendant's apartment complex with neither a search warrant nor an arrest warrant. *Id.* at 1424. The officers

were looking for another man, a suspect in a series of fraudulent bank withdrawals. *Id.* Officer McClure in *Shaibu* provided the following description of the initial exchange occurring in the hallway outside of defendant's apartment:

> [I]t was [a] rather . . . quick occurrence[ ]. I think I asked him if Idahosa Basuaye was inside, and he [Shaibu] had turned around and started walking to the apartment, and we followed him into the apartment.

The court further stated that

> [a]ccording to the District Court's findings of fact, soon after Officer McClure identified himself, Shaibu walked back "into the apartment, leaving the door open as the detectives followed him inside. Shaibu did not ask them to wait outside, to leave, or to produce a search warrant." The officers did not ask permission to enter Shaibu's apartment nor state their intention to do so, but simply followed Shaibu through the open door. The District Court found that Shaibu's failure to object created an "implicit invitation" to enter and search the apartment.

*Id.* The Ninth Circuit reversed the district court's holding that Shaibu had created an "implicit invitation" by walking back into his apartment.

The *Shaibu* case presents a slightly different scenario from the one presented by the government's witnesses. In *Shaibu* there was no request for permission to enter, and the court refused to infer such a request. In the case at bar, according to the government, Sgt. Blough initially requested permission to enter. However, according to defense witnesses, the officers entered without first asking permission. In fact, all three defense witnesses testified that Mr. Hardeman was not even at the door at the time of the officers' initial entry. Assuming arguendo that Sgt. Blough did not request permission to enter, but instead pushed the door open after it was opened first by Ms. Anderson, as she claims, then the instant situation presents an even more compelling case than *Shaibu* for holding that defendant never consented to the warrantless entry.

Another case with a factual background closely paralleling the government's version of events in the instant case is *United States v. Miller*, 933 F.Supp. 501 (M.D.N.C.1996). In *Miller*, just as in the case at hand, the parties were in dispute as to the events leading up to the officers' warrantless entry. *See id.* at 502–03. According to the government in *Miller*, detectives asked if they could come in and speak to defendant. *Id.* at 502. Defendant allegedly "stepped backwards and raised his arms as if to welcome them into his apartment." *Id.* However, "[d]efendant did not expressly inform the detectives that they could or could not enter his apartment." *Id.* Defendant's version differed principally from the government's in that defendant contended that after taking a step backward, he indicated to detectives that he did not ask them to come in, and also stated that "I don't know why you're here, and why are you bothering me." *Id.* at 503.

The court in *Miller*, after a discussion of the so-called "knock and talk" procedure, resolved the factual dispute in defendant's favor, finding that "[a]fter several questions, the Defendant took a step back into his apartment but did not invite the detectives into his apartment." *Id.* at 505–06. The court found that

> [b]ased on several facts presented at the hearing, the Court does not agree that the Defendant's stepping back action meant an invitation to step in. For instance, the Defendant's demeanor when he answered the door, the immediate presence of the men he had just barely expectorated on, taken in conjunction with his overall reaction to the detectives' presence, all support the Court's finding that the Defendant did not give consent. The Defendant was concerned that he had almost expectorated on the detectives and prior to opening the door had expressed this concern to his friend, Preston Brooks, who was still on the phone.

*Id.* at 506. Other factors militating against a finding of consent included defendant's expressing his desire to be left alone, his objecting to the detectives presence, and never verbalizing the consent to search. *Id.* As the court concluded,

> [u]ltimately, the "knock and talk" procedure retains its acceptable legal status *only if* the occupant gives voluntary consent to search his or her residence. In essence, the "knock and talk" procedure used by the detectives here would allow police officers, who lack probable cause for a search warrant, to gain access into one's home in a manner which otherwise would not be constitutionally permissible, that is, conducting a search without a search warrant or consent.

Id. at 505 (emphasis added).

■ Applying the *Schneckloth* totality of circumstances test for determining voluntary consent, as well as taking into consideration other courts' handling of similar cases involving warrantless entry into a private home, this Court holds that under the facts presented in the case at bar defendant did *not* consent to the police officers' entry into his home. Even taking as true the government's version of events, as articulated by Sgt. Blough, there was absolutely no clear and positive testimony that defendant Hardeman's consent was "unequivocal, specific and freely given." *Miller*, 933 F.Supp. at 505 (quoting *United States v. Butler*, 966 F.2d 559 (10th Cir.1992)). Although in limited circumstances consent may be inferred from the cooperative conduct of a defendant, courts are justifiably hesitant to sanction entry to the home based on inferred consent. *Shaibu*, 920 F.2d at 1426; *see also United States v. Impink*, 728 F.2d 1228, 1232 (9th Cir.1984); *United States v. Patacchia*, 602 F.2d 218, 219 (9th Cir.1979); *cf. United States v. Gilbert*, 774 F.2d 962, 964 (9th Cir.1985). Just as in *Miller*, this Court does not find that defendant's alleged stepping back into his residence constituted an invitation to enter. Furthermore, the government has failed to satisfy its burden of proving that defendant Hardeman's consent, even if it may be implied from his conduct, was given "without duress or coercion." *Miller*, 933 F.Supp. at 505.

The Court is frankly troubled by the freewheeling and inappropriate conduct of the police officers in this case. The subsequent search of defendant's living room and bedroom made perhaps as much as one hour

after defendant's arrest was clearly unlawful. The government wisely has declined to introduce any evidence obtained from that search. As the United States accurately notes in its brief, this subsequent warrantless search could not have been justified as a "search incident to arrest" because there was a "substantial temporal disruption" between defendant's arrest and removal from the home and the beginning of the search. *See* Government's brief in support of response, p. 4. Further, as previously noted, this search was conducted after defendant had been arrested and removed from the scene, and after the prosecuting attorney had declined a request that a search warrant for the home be sought.

■■■ It is well-settled that police, contemporaneously with an arrest, may search a subject's person and the area "within his immediate control," or that area satisfying the so-called "wingspan" test. *See Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *see also U.S. v.. Porter,* 738 F.2d 622 (4th Cir.), *cert. denied,* 469 U.S. 983, 105 S.Ct. 389, 83 L.Ed.2d 323 (1984).[6] However, in the instant case, it is important to point out that the officers search of the living room and bedroom fails to qualify as a search incident to arrest for two distinct reasons. First, as the government readily acknowledges, it was made long after defendant was arrested and removed from the premises. Second, the search was not made of the area within defendant's immediate control at the time of his arrest, but instead was conducted in the area encompassing two rooms of the residence. It would be ludicrous to maintain that this wide-sweeping search was within defendant's wingspan, even had the search been conducted at the time of his arrest. Moreover, given the manifest impropriety of this search, it strains credulity that the officers could have had a "good faith" belief that the search was somehow proper.[7] This misconduct by the officers, in clear violation of the defendant's constitutional rights, reflects a mind-set of a determination to conduct a search without regard to defendant's rights and thereby casts further doubt upon the government's claim that the initial entry of the home and questioning of defendant and the seizure of his shotgun were pursuant to his consent.

■■■ It should also be mentioned that the subsequent search of the living room and bedroom cannot not be justified under the plain view exception to the warrant requirement. Such an exception may be found where the following elements are satisfied: (1) the items seized were in plain view; (2) their incriminating character was immediately apparent; and (3) the items were viewed by an officer lawfully located in a place from which they could be seen and seized by an officer who has a lawful right of access to the items themselves. *See Horton v. California,* 496 U.S. 128, 142, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). In the case at bar, there is no indication that the handguns and ammunition were in plain view. Even had the items been in plain view, it is apparent that

6. In *Chimel,* the United States Supreme Court made clear that there is "ample justification" for a rule allowing the warrantless search of the arrestee's person and area of immediate control. *See* 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685. Such reasons include preventing the subject from concealing or destroying evidence, and preventing resistance or escape. *See id.; see also* 1 W. LaFave & J. Israel, *Criminal Procedure* § 3.6 (1984). However, the Supreme Court was careful to distinguish searches such as the one conducted in this case, representing an abuse of the "search incident to arrest" doctrine:

[t]here is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant. [*See Katz v. United States,* 389 U.S. 347, 357–358, 88 S.Ct. 507, 514–515, 19 L.Ed.2d 576.] The 'adherence to judicial processes' mandated by the Fourth Amendment requires no less.

*Chimel,* 395 U.S. at 763, 89 S.Ct. 2034.

7. In the government's brief, the United States suggests that "it could be argued that the police officers in the this case acted in 'good faith' upon their belief that the warrantless search 'incident to arrest' was proper." Then, the government retreats from this untenable "good faith" stance, admitting it "is not asserting the 'good faith' argument, and, as stated, is not using anything gleaned from that search." Government's brief in support of response, p. 4.

the officers were not lawfully present in the premises at the time of the search.

The Court finds the testimony of defendant's three witnesses to be highly credible, especially in light of the fact that their accounts were completely consistent and mutually reinforcing. In addition, the Court is concerned by the apparent inconsistency between Sgt. Blough's account and Officer Meyer's characterization of events. The sergeant testified that defendant made no verbal response to the request for entry. Officer Meyer contradicted this testimony when he asserted that defendant "stated that we could enter the house." Transcript of December 8, 1998 Hearing, p. 25. This Court is therefore inclined to afford greater weight to defendant's version of events.

In summary, it is apparent that no matter how this Court resolves the factual dispute, defendant did not invite the officers into his residence. Although in some cases consent to search or an invitation to enter may be inferred from conduct, the Court will not make such an inference in a case such as this one, involving the violation of the sanctity of an individual's home. Furthermore, the officers in this case clearly overstepped their bounds in conducting the subsequent search after defendant was arrested and removed from the premises. This is a factor which the Court finds weighs heavily in the totality of circumstances analysis, as applied in the instant case. In light of all the foregoing considerations, this Court holds that the officers' warrantless entry into defendant's residence was in violation of the Fourth Amendment, and no exception to the warrant requirement being applicable, defendant's motion to suppress evidence must be granted.

## ORDER

NOW, THEREFORE, IT IS HEREBY ORDERED that defendant's motion to suppress evidence is GRANTED.

SO ORDERED.