**UNITED STATES of America,**

v.

**Kasim Jerell MILLER.**

**No. 2:95cr239–1.**

United States District Court,
M.D. North Carolina,
Greensboro Division.

April 5, 1996.

Richard Glaser, Assistant United States Attorney, Greensboro, for plaintiff.

Theophilus Stokes, Greensboro, for defendant.

## MEMORANDUM OPINION

BEATY, District Judge.

This matter comes before the Court on Defendant's Motion to Suppress. Defendant is charged with one count of possession with intent to distribute cocaine base ("crack") in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) and one count of carrying and using a firearm during the commission of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1). For the reasons below, the Court will grant Defendant's Motion to Suppress any and all evidence seized from his apartment.

## I. FACTS

On September 12, 1995, Detective J.E. Hoover of the Greensboro Police Department received a tip from an anonymous caller regarding narcotic activity in Apartment # 405 at 4901 Lawndale Drive in the Hedges Apartment complex in Greensboro, North Carolina. Pursuant to this unverified information, Detective Hoover called another officer, Detective J.J. Sturm. Detective Sturm contacted Detective McMinn. All three detectives then went to the location.

Upon arriving at Apartment # 405, the detectives stood below the apartment discussing ways in which they could get into the Defendant's residence. The detectives ultimately decided to attempt a "knock and talk" procedure since they had determined that the information received from the anonymous caller was not of sufficient reliability to obtain a search warrant. The "knock and talk" procedure consists of knocking on a suspect's door to engage in conversation regarding narcotic activity occurring in the suspect's residence, and then seeking the resident's consent to search. At the suppression hearing, Detective Sturm testified that they decided to perform this procedure because admittedly they did not have probable cause to obtain a search warrant. In addition, during the suppression hearing, there was no evidence submitted by the government to show the presence of exigent circumstances that would justify a warrantless entry into the Defendant's apartment.

While standing below the balcony of Defendant's apartment discussing their strategy, an individual, later to be identified as the Defendant, leaned over the balcony rail and expectorated, barely missing the detectives. Defendant noticed the men, apologized, and went back into his apartment. However, he was not aware, nor were there any visible signs, that the men he apologized to were detectives.

The detectives proceeded up the stairs and knocked on the defendant's door. After three to four minutes, the detectives knocked again. The Defendant came to the door identifying himself as Kasim Miller. The detectives identified themselves, and explained that they had received an anonymous tip indicating that there were narcotics within his apartment.

The parties dispute the next series of events. According to the government, the detectives asked could they come in and speak to him about the information they had received. It appeared to them that the Defendant stepped backwards and raised his arms as if to welcome them into his apartment. However, the Defendant did not expressly inform the detectives that they could or could not enter his apartment. Once in the apartment, Detectives McMinn and Sturm asked could they search the Defendant's apartment. Detective Hoover remained standing outside the apartment. Although the detectives had weapons, the weapons were not drawn or visible.

Detective McMinn testified that he inquired if anyone else was in the apartment. This was asked out of concern for the safety of the detectives. McMinn then walked back towards the bedroom and asked the Defendant to accompany him. McMinn testified that the Defendant accompanied him on the initial walk through to determine if there was anyone else in the apartment. The Defendant denies that he walked with McMinn through the apartment. As McMinn walked to the bedroom, Detective Hoover came into the apartment and began searching the kitchen area because he thought the Defendant had given them consent to search the apartment. When Hoover found some initial evidence of marijuana, he notified McMinn and they placed the Defendant under arrest. A further search revealed the presence of crack cocaine. During the suppression hearing, each detective acknowledged that during the entire encounter, the Defendant never verbalized his consent to search his apartment.

Although there are similarities, the Defendant's version of the facts are somewhat different from the detectives. According to the Defendant, he was on the phone with his friend, Preston Brooks, when the men initially knocked on the door. For this reason, he did not hear the first two knocks. Once he heard someone knocking at the door, he laid the phone down without hanging up and opened the door. At the time, he did not know the men were detectives. Before the detectives identified themselves, the Defendant was concerned that the men had come to his apartment because he had almost expectorated on them.

The Defendant contends that although he opened the door to answer their knock, he did not welcome the detectives into his apartment. Instead, he indicates that when he took a step backwards, the detectives stepped in without his consent. The detectives immediately asked him whether he was against the war on drugs, and did he support the police in doing their job. The Defendant then stated, "I don't know why you're here, and why are you bothering me." The detectives ordered him to hang his phone up. The Defendant again asked why he was being

bothered. The detectives then asked for consent to search. The Defendant continued to indicate that he did not ask them to come in. At the hearing, Preston Brooks corroborated portions of the Defendant's statement by indicating that he heard the Defendant say that he did not want them in his apartment.

As a result of the Defendant raising an objection to the presence of the detectives, he contends that they asked for his identification in order to determine whether he had any outstanding warrants against him. They advised him that they would leave his apartment if there were no outstanding warrants against him. After checking for outstanding warrants, the detectives never indicated to Defendant that there were any outstanding warrants nor did they return his driver's license to him. Defendant testified that the detectives continued to ignore his questions as to why they were bothering him.

Similar to the testimony of Detective McMinn, the Defendant states that the detectives asked him would he escort them around his apartment. The Defendant responded that he would not follow them anywhere after which the detectives went on through his apartment while he was being restrained. When the Defendant became very upset, Detective Hoover told him to calm down. The Defendant further contends that without his consent, the Detectives continued to search his apartment. After finding controlled substances, the detectives placed him under an arrest.

## II. DISCUSSION

The Defendant contends that the evidence seized from his apartment must be suppressed because he did not expressly give consent to search his apartment. The government, however, contends that during the entire encounter, the Defendant understood what he was being asked, was free to come and go as he pleased, and at no time gave any indication that he was not consenting to the search. The government further argues that the detectives never subjected the Defendant to any threats, force, or physical intimidation to get him to consent to the search.

The Fourth Amendment has consistently protected an individual's right to privacy in his own home by providing:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

"It is perfectly clear that the evil the Amendment was designed to prevent was broader than the abuse of a general warrant. Unreasonable searches or seizures conducted without a warrant at all are condemned by the plain language of the first clause of the Amendment." *Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1979). Physical entrance into the home of another without a warrant is the chief evil the Fourth Amendment has sought to alleviate. *Id.* The Supreme Court has long adhered to the view that the warrant procedure helps to minimize the risk of unnecessary intrusions into the privacy of one's home. *Id.* at 586, 100 S.Ct. at 1379. The Supreme Court has made this view very clear by noting:

> The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home-a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their ... houses ... shall not be violated." That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the home. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

*Id.* at 589–90, 100 S.Ct. at 1381–82 (citations omitted). "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 586, 100 S.Ct. at 1379. Because of this presumption, the Fourth Amendment only allows entry into a home to conduct a search in situations where consent is given, exigent circumstances exist, or a warrant is procured. *Steagald v. United States*, 451 U.S. 204, 211, 101 S.Ct. 1642, 1647, 68 L.Ed.2d 38 (1980).

■ Consent has long been recognized as one of the few exceptions to the warrant requirement. In cases where the government alleges that consent was given, the government must prove that an individual " 'freely and intelligently [gave his or her] unequivocal and specific consent to the search, uncontaminated by any duress or coercion, actual or implied.' " *United States v. Morrow*, 731 F.2d 233, 236 (4th Cir.1984), *cert. denied*, 467 U.S. 1230, 104 S.Ct. 2689, 81 L.Ed.2d 883 (1984) (quoting *United States v. Vickers*, 387 F.2d 703, 706 (4th Cir.1967), *cert. denied*, 392 U.S. 912, 88 S.Ct. 2069, 20 L.Ed.2d 1369 (1968), (quoting, *Channel v. United States*, 285 F.2d 217, 219 (9th Cir. 1960)). This "burden is a concededly heavy one since the Fourth Amendment admits but 'few specifically established and well-delineated exceptions' to the warrant requirement." *Id.* (quoting *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). In determining whether consent was voluntarily given, the courts look at several factors: the number of officers present at the time of consent; the subjective state of mind, intelligence and age of the consenting party; the length of detention; and the individual's knowledge of his or her right to refuse to consent. *Id.* Whether consent is voluntary is a question of fact determined by the totality of the circumstances. *Id.; United States v. Gordon*, 895 F.2d 932, 938 (4th Cir.1990), *cert. denied*, 498 U.S. 846, 111 S.Ct. 131, 112 L.Ed.2d 98 (1990). It is acknowledged, however, that the voluntariness of a person's responses does not depend on his having been so informed of his right to refuse. *United States v. Mendenhall*, 446 U.S. 544, 555, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980), *reh'g denied*, 448 U.S. 908, 100 S.Ct. 3051, 65 L.Ed.2d 1138 (1980). Therefore, it is no doubt reasonable for the

police to conduct a search once they have been permitted to do so. *Schneckloth v. Bustamonte,* 412 U.S. 218, 242, 93 S.Ct. 2041, 2055, 36 L.Ed.2d 854 (1973).

In this case, the government argues that the evidence obtained under the "knock and talk" procedure was an acceptable strategy in obtaining consent to search from the Defendant. As indicated herein, "knock and talk" has been defined as "a noncustodial procedure where the officer identifies himself and asks to talk to the home occupant and then eventually requests permission to search the residence." *United States v. Cruz,* 838 F.Supp. 535, 537 (D.Utah 1993). The "knock and talk" tactic has been upheld as a manner of obtaining consent to search. *Id.* at 543; *see also United States v. Tobin,* 923 F.2d 1506, 1509 (11th Cir.1991), *reh'g denied,* 935 F.2d 1297 (1991), *cert. denied,* 502 U.S. 907, 112 S.Ct. 299, 116 L.Ed.2d 243 (1991) (same). However, its use is just one of the circumstances surrounding the event that the Court may consider in determining whether consent was given, and if so, then whether it was given voluntarily. Although this procedure has been deemed acceptable in certain circumstances, the procedure in this case was conducted under circumstances where the detectives admittedly had insufficient evidence to obtain a search warrant.

Ultimately, the "knock and talk" procedure retains its acceptable legal status only if the occupant gives voluntary consent to search his or her residence. In essence, the "knock and talk" procedure used by the detectives here would allow police officers, who lack probable cause for a search warrant, to gain access into one's home in a manner which otherwise would not be constitutionally permissible, that is, conducting a search without a search warrant or consent. This same reasoning has been applied to an attempt by police to arrest a person in his home without a warrant in which the *Payton* court stated, "To be arrested in the home involves not only the invasion attendant to all arrests but also an invasion of the sanctity of the home ... [which] ... is simply too substantial an invasion to allow without a warrant, at least in the absence of exigent circumstances, even when it is accomplished under statutory au-

thority and when probable cause is clearly present." 445 U.S. at 589, 100 S.Ct. at 1381 (quoting *United States v. Reed,* 572 F.2d 412, 423 (2d Cir.1973), *cert. denied, Goldsmith v. United States,* 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978)). The *Payton* court's concern for the invasion would apply equally to a warrantless search of the home, unless it otherwise complies with the recognized exceptions to the search warrant requirements because "[i]n terms that apply equally to seizures of property and seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house." *Id.* 445 U.S. at 590, 100 S.Ct. at 1381. However, since the "knock and talk" procedure centers around whether the occupant gave consent, the Court will focus on whether consent to search his apartment was given by the Defendant under the circumstances of this case.

█ To admit evidence obtained from a search of a residence without a warrant, where it is also contended that consent was given, the following factors must be present:

(1) There must be a clear and positive testimony that consent was unequivocal and specific and freely given; and

(2) The government must prove consent was given without duress or coercion, express or implied.

*Cruz,* 838 F.Supp. at 543 (quoting *United States v. Butler,* 966 F.2d 559 (10th Cir. 1992)).

█ After reviewing the evidence and the testimony at the suppression hearing, the Court resolves the factual dispute between the government and Defendant in the following manner. After planning how to use their "knock and talk" procedure, the detectives knocked on the Defendant's door, and he answered. The detectives explained their presence and asked him whether he was against the war on drugs. In response, the Defendant stated that he knew they had a job to do, but he disagreed with some of the police tactics. The detectives specifically stated that they could find out whether the anonymous tip they had received was correct, if he would allow them to search his apartment for drugs. After several questions, the Defendant took a step back into his apartment but did not invite the detectives

into his apartment. The detectives followed the Defendant by stepping into his apartment. Once the detectives had stepped into his apartment, the Defendant informed the detectives that he had not invited them into his apartment.

At the suppression hearing, the detectives testified that the Defendant's stepping back motion was a signal to them that he was inviting them in to search his apartment. Based on several facts presented at the hearing, the Court does not agree that the Defendant's stepping back action meant an invitation to step in. For instance, the Defendant's demeanor when he answered the door, the immediate presence of the men he had just barely expectorated on, taken in conjunction with his overall reaction to the detectives' presence, all support the Court's finding that the Defendant did not give consent. The Defendant was concerned that he had almost expectorated on the detectives and prior to opening the door had expressed this concern to his friend, Preston Brooks, who was still on the phone.

Furthermore, several other factors support the conclusion that the Defendant did not give consent. For example, when responding to the detectives' request for cooperation, the Defendant consistently expressed his desire to be left alone. The Defendant went so far as to verbally express more than once his objection to the detectives' presence. In fact, if the Court accepts Detective McMinn's testimony that the Defendant never verbalized a consent to search, the Defendant's statement that he had not invited them in provided sufficient notice that the Defendant was not freely giving consent to search his apartment. More importantly, during the entire encounter, the Defendant's actions were very disruptive which caused the detectives to ask him to calm down. His disruptive behavior demonstrated a position inconsistent with an expression of unequivocal consent to search and as discussed previously should have put the detectives on notice that he was not consenting.

Furthermore, the fact that the detectives deemed it necessary to take so many steps to get into Defendant's apartment are entirely inconsistent with a logical belief that the Defendant had given them unequivocal consent to either enter or search his apartment. In other words, if the Defendant had clearly and unequivocally consented, it would have been unnecessary for them to request the Defendant's identification in order to determine whether he had any outstanding warrants. Additionally, it would have been unnecessary for the detectives to indicate that if he did not have any outstanding warrants, they would leave his apartment.

One other fact also points to consent not being given. In response to Defendant's inquiry as to why they were bothering him, Detective McMinn jokingly reminded Defendant that he thought the Defendant was interested in helping them with the war on drugs. These actions taken by the detectives make it less likely that the Defendant unequivocally consented to a search of his apartment without coercion, expressed or implied, as it may have existed under the facts of this case. This is especially the case here where there is no evidence that the Defendant ever expressly stated to the detectives that he was consenting to their entry or search of his apartment.

## III. CONCLUSION

Therefore, based on the totality of the circumstances, the Court finds that the government has failed to establish that the Defendant freely, voluntarily, and unequivocally consented to the detectives entering or searching his apartment in the absence of coercion, either expressed or implied. Accordingly, based on the foregoing, the Defendant's Motion to Suppress is granted.