**UNITED STATES of America, Plaintiff,**

v.

**Jon Courtney CABRERA, Defendant.**

**No. 00–40013–01–SAC.**

United States District Court, D. Kansas.

Sept. 18, 2000.

Jon Courtney Cabrera, Topeka, KS, pro se.

Donald R. Hoffman, Topeka, KS, pro se.

Gregory G. Hough, Office of U.S. Atty., Topeka, KS, for Plaintiff.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

The case comes before the court on the defendant's following pretrial motions: Motion to Suppress (Dk.17) and Motion for Bill of Particulars (Dk.19). The government has filed separate responses (Dks. 21 and 23) opposing the respective motions. The court heard the parties' arguments and evidence on July 6, 2000. After reviewing all matters submitted and researching the relevant law, the court issues the following as its ruling on these motions.

## INDICTMENT

The defendant, Jon Courtney Cabrera, is charged in a single count indictment with having possessed with the intent to distribute approximately one gram of lysergic acid diethylamide, commonly known as LSD, on November 5, 1999, in violation of 21 U.S.C. § 841(a)(1).

## MOTION TO SUPPRESS

At the hearing, the government presented the testimony of United States Postal Inspector Richard Britain. He was the officer in charge of the investigation on November 5, 1999, that began with the knock and talk at the defendant's residence and ended with the seizure of the express mail package addressed to the defendant. The defendant presented his own testimony regarding the events that occurred on the same afternoon. While each witness gave his own account of the events occurring that afternoon, the accounts were in substantial agreement in many respects but differed in several critical areas. The following findings of fact will reflect the court's credibility determinations in those areas where the witnesses' accounts conflicted.

### Findings of Fact

An Express Mail envelope No. EJ747661456US went through the Kansas City Air Mail Center in Kansas City, Missouri, on November 5, 1999. It was addressed to "Jon Cabrera, 1701 Vermont, Lawrence, KS 66044." Its mailing label carried a return address of "Mike Smith, 102 Precita, SF, CA 94110." Richard Britain, a United States Postal Inspector, was performing routine profiling of Express Mail when he noticed this envelope. He observed the return address used a common name, the return address appeared to have been erased and written over, the zip code in the return address did not match the zip code for the place where the package was mailed, and the package appeared to contain small bottles or vials.

Inspector Britain checked the return address by computer and learned it did not exist. He then called the San Francisco Postal Police and was informed that 102 Precita was a fictitious or non-existent address. Inspector Britain had a narcotics canine sniff the exterior of the envelope, but there was no positive alert. Believing the package may contain steroids to which a dog would not alert, Inspector Britain continued his investigative efforts.

Inspector Britain called the Lawrence Police Department and spoke with Officer Chamberlin assigned to its drug unit. Chamberlin did not have any information about Jon Cabrera or 1701 Vermont. Because he did not have enough facts for a search warrant, Inspector Britain decided to conduct a "knock and talk." This investigative procedure entailed having Britain wear a postal service uniform and deliver the package in the hope that he can persuade the addressee to open the package in his presence.

Inspector Britain drove to Lawrence and picked up a postal service vehicle to use in his undercover delivery. Dressed in a postal service uniform, Inspector Britain took the package No. EJ747661456US to 1701 Vermont, Lawrence, Kansas, shortly before noon on November 5, 1999. Two other postal inspectors and two officers with the Lawrence Police Department followed in two separate vehicles. They parked their vehicles a short distance away and observed the delivery. On the porch of the residence, Britain was greeted by two persons whom he described as "a long-haired man" and a woman who was wearing a tie-dyed dress and playing a guitar. When Britain announced he had a package for Jon Cabrera, the woman asked if she could sign for it, but Britain responded that Jon Cabrera should sign for it. The woman said Cabrera was across the street and directed the other man to get him. Minutes later, two men approached the residence and the man, who presumably was Jon Cabrera, jokingly told Britain that if the delivery had been made a minute later then it would have been free.

Britain said he needed to see Cabrera's identification and to get his signature for

the package. Cabrera showed his driver's license and then signed his name to the form on the package and accepted delivery of it. After raising his hand to signal the other officers to approach, Inspector Britain flashed his badge and identified himself as a "federal agent." Two cars then pulled up to the residence, the four officers exited and converged towards the porch. At that point, Inspector Britain said that Cabrera "needed to open the package." When Cabrera asked what was going on, Britain said that a narcotics canine had alerted to the package and that he had some concerns about its contents.[1] Cabrera said nothing more and complied with what he had been told.

With Britain and another postal inspector standing a foot away, Cabrera opened the exterior package and inside was another express mail envelope that was not sealed. In the second envelope was a padded envelope, and inside of it was a plastic sack. Cabrera took out the plastic sack and Inspector Britain reached over and assisted in unfolding the white plastic sack which contained another plastic sack. Inspector Britain opened this last plastic sack and looked over the contents that included: candy consisting of "Hershey's Kisses" and "Starburst," small bottles of a breath solution marked "Ice Drops," and a plastic toy cellular telephone. Britain set the sack on the table, and the other inspector began checking it out. Cabrera voiced no objection to Inspector Britain's actions.

Britain asked Cabrera why he would receive a package with these items. Cabrera answered that he assumed the candy was left over from Halloween and the breath solution was for his bad breath. During this questioning, Britain observed that Cabrera was becoming more nervous. From these circumstances, Britain said he became "more concerned that possibly some of the items . . . might contain narcotics."

A short time later, the other officers took the sack from the table and walked towards their vehicles with it. They opened the breath solution bottles and smelled them. Inspector Britain eventually smelled the bottles also and detected nothing but the smell of mint. The defendant voiced no objection to the officers' actions.

Inspector Britain continued to question Cabrera about why the dog had alerted to the package and why the return address was fictitious. Cabrera said he had no explanation for the dog alert but that he believed the package was from Josh Porter who was a friend in the music business and who often sent him compact discs, t-shirts, and breath solutions. Inspector Britain testified "at that point of time, we didn't know what in the world we had. We just had the items there. It wasn't clearly narcotics that we could see, although from his demeanor, it seemed a little strange."

Inspector Britain next asked Cabrera for the address of Josh Porter and if he would call Josh "to try to clear things up." Cabrera told officers he would need to retrieve the numbers from the address book in his room. Britain told Cabrera that he was not free to go inside his house without an officer accompanying him. Britain testified that Cabrera was free to go elsewhere, so long as they could watch him. Cabrera refused to let an officer inside his house and subsequently remembered a telephone number for Josh Porter. Using the Postal Inspection Service's cellular telephone, Inspector Boyer dialed the number and gave the phone to Cabrera to talk. Standing in the front yard with the officers all around him trying to overhear the conversation, Cabrera described the situation over the telephone, asked about the package's contents, and asked whether Josh would speak with the federal agents. The conversation ended quickly, and Ca-

---

1. The court found the defendant's testimony in this regards more credible. Inspector Britain testified that he could not remember much about what he said to Cabrera about why they were interested in the package.

brera reported that Porter had said he was busy and could not talk now.

Shortly after this phone call, the five officers still standing around Cabrera began trying to persuade him to give them the package for testing. Inspector Britain testified that his approach was a little more aggressive even though they did not know whether the package contained drugs or not. Officers asked Cabrera several times for the package, but he refused. They told him that they "needed to send" the contents to the lab "to see what was inside of it." Inspector Hamilton suggested that the Postal Service would replace the items if he gave them the package. Britain opined from the witness stand that Cabrera could have told them "to get lost and at this point we probably would have had to just get lost."

After turning them down at least three times, Cabrera asked the officers what would happen if he did not give them the package. Inspector Britain answered that an officer would stay with Cabrera while the others got a search warrant, this would take two hours, and neither he nor the judge would be happy about it. Despite making these comments, Inspector Britain testified that he was actually thinking the following: "We really were about ready to go, because we had two other packages to deliver, and we thought at that point in time we might just have to—something we were going to have to possibly leave. We were kind of at a loss at this point in time." In a matter of minutes, Cabrera gave Inspector Britain the package and signed a consent form turning over possession. Sometime later, Cabrera was sent replacement candy and breath solution.

At no time during the above encounter did the officers advise Cabrera of his right to refuse to talk or cooperate with them. Inspector Britain also testified that if Cabrera had refused to open the package in his presence, "I would have had to leave him with the package because I didn't have enough at that point in time to really get involved and I had two other packages besides that had smelled of marijuana so I

probably would have gone off with those and left this thing."

*Arguments*

The defendant seeks to suppress all physical evidence seized from the Express Mail envelope No. EJ747661456US by government agents on November 5, 1999. The defendant argues that this envelope was addressed to him and that the government agents discovered and obtained the envelope's contents during an illegal, warrantless, and non-consensual search of the envelope. The defendant denies that he ever consented to opening the envelope. Rather, Inspector Britain with the four other agents present simply directed him to open the package and he obeyed them as he had no other choice. If the court finds that consent to search was given, the defendant alternatively argues this consent was not freely and voluntarily given. The defendant likewise challenges the voluntariness of his consent to have the package taken and tested. The government maintains the defendant did consent to the search and seizure of the envelope and did so freely and voluntarily.

*Governing Law*

A warrantless search is *"per se* unreasonable" unless one of specifically established exceptions, like consent, is present. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (quotations omitted). Valid consent is that which is freely and voluntarily given. *United States v. Patten*, 183 F.3d 1190, 1194 (10th Cir.1999) (citation omitted). Voluntariness is a question of fact to be determined from the totality of all the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. at 227, 93 S.Ct. 2041. A court makes this determination without presuming the consent was voluntary or involuntary. *United States v. Hernandez*, 93 F.3d 1493, 1500 (10th Cir.1996).

 The government bears the burden of proving valid consent to a warrantless search. *United States v. Patten*, 183 F.3d at 1194. The government does not

discharge its burden "by showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 549, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *see United States v. Rodriguez*, 525 F.2d 1313, 1316 (10th Cir.1975). The government first "must present 'clear and positive testimony that consent was unequivocal and specific and freely and intelligently given.'" *United States v. Pena*, 143 F.3d 1363, 1367 (10th Cir.) (quoting *United States v. Angulo–Fernandez*, 53 F.3d 1177, 1180 (10th Cir.1995)), *cert. denied*, 525 U.S. 903, 119 S.Ct. 236, 142 L.Ed.2d 194 (1998). The government also must prove that the officers used no implied or express duress or coercion in obtaining the consent. *Id.; United States v. Hernandez*, 93 F.3d at 1500; *United States v. McRae*, 81 F.3d 1528, 1537 (10th Cir.1996).

■ There are various factors relevant to this determination. An officer's failure to advise that a person may refuse to consent is relevant, but it is only one factor and is not dispositive. *United States v. Pena*, 143 F.3d at 1367; *see also United States v. Orrego–Fernandez*, 78 F.3d 1497, 1505 (10th Cir.1996) ("Failure to inform a defendant that he was free to leave or that he could refuse consent are 'important factors in our consideration'" of whether consent was voluntary, but they are not dispositive); *United States v. Little*, 60 F.3d 708, 713 (10th Cir.1995). Other relevant factors include the number of officers present, "'physical mistreatment, use of violence, threats, threats of violence, promises or inducements, deception or trickery, and physical and mental condition and capacity of the defendant within the totality of the circumstances.'" *United States v. Pena*, 143 F.3d at 1367 (quoting *United States v. McCurdy*, 40 F.3d 1111, 1119 (10th Cir. 1994) (internal quotation omitted)); *see United States v. Bozarth*, 141 F.3d 1186, 1998 WL 163387, at *3 (10th Cir. Apr.8, 1998) (Table) (Because the pressure to acquiesce to an officer's request may be increased if more than one officer is present, this is a relevant factor, but not a dispositive one.) (citing *United States v. Orrego–*

*Fernandez*, 78 F.3d at 1505) Another relevant factor may be "the extent and level of the defendant's cooperation with the police." *United States v. Tompkins*, 130 F.3d 117, 121 (5th Cir.1997) (quotation omitted), *cert. denied*, 523 U.S. 1036, 118 S.Ct. 1335, 140 L.Ed.2d 495 (1998). Finally, the court must determine whether the consent was the result of any detention or seizure in violation of the Fourth Amendment. A court must remain mindful that these factors are not evaluated in a vacuum but rather in the totality of the circumstances.

Inspector Britain testified that he and the fellow officers employed a "knock and talk" procedure. "Courts have defined this tactic as 'a noncustodial procedure [in which] the officer identifies himself and asks to talk to the home occupant and then eventually requests permission to search the residence.'" *United States v. Hardeman*, 36 F.Supp.2d 770, 777 (E.D.Mich. 1999) (quoting *United States v. Miller*, 933 F.Supp. 501, 505 (M.D.N.C.1996)). Courts generally have upheld this investigative procedure as a legitimate effort "to obtain a suspect's consent to search." *Id.* (citations omitted). "[C]ourts may consider the use of the 'knock and talk' procedure as one of the circumstances in evaluating whether consent was given and, if so, whether consent was given voluntarily." *Id.* (citing *Miller*, 933 F.Supp. at 505 and *United States v. Tobin*, 923 F.2d 1506, 1509 (11th Cir.), *cert. denied*, 502 U.S. 907, 112 S.Ct. 299, 116 L.Ed.2d 243 (1991)).

### Discussion and Analysis

■ The government has failed to satisfy its burden of proving with clear and positive testimony that Cabrera consented to opening the package and did not merely acquiesce to the officers' show of lawful authority. Highly motivated to learn whether the package contained contraband, Inspector Britain employed a knock and talk procedure that was plainly designed to impress Cabrera with the officers' lawful authority to be present while the package was opened. Cabrera, as

would most reasonable persons be, was initially bewildered to learn upon receipt of the package that the mailman was actually an undercover "federal agent" and that the situation was so serious as to warrant four other officers converging on the scene. Exploiting this display of police presence, Inspector Britain told Cabrera that he "needed" to open the package now. This statement is unclear as to whether Britain was asking Cabrera if he would open the package or was just telling Cabrera that he needed to open the package. *See United States v. Cole*, 195 F.R.D. 627, 631 (N.D.Ind. 2000).

Cabrera showed either his confusion or some measure of fortitude when he asked Britain what was going on. In response, Britain did not clarify that he was asking for Cabrera's consent. Nor did he advise that Cabrera had a choice to cooperate.[2] Rather, Inspector Britain simply reiterated his lawful authority to be present by saying that a narcotics dog had alerted to the package and that other features of the package were also suspicious. A reasonable person upon hearing this response would likely believe that the officers were authorized under these circumstances to discover why the dog had alerted. Britain said nothing to contradict this plain impression that he and his fellow officers were lawfully entitled to know what was inside the package. Moreover, Britain relied on a blatant deception—the positive dog alert—to further the impression that Cabrera had no choice but to permit their search.

Cabrera's reaction shows the effectiveness of what had been conveyed to him. He asked no further questions and voiced no objections. In fact, he said nothing and simply began opening the package in acquiescence to what he reasonably understood was the officers' lawful authority. Consequently, the court finds no credible, clear and positive testimony that the defendant was ever asked to give his consent

to opening the package for the officers. Nor is there clear and positive testimony to sustain a finding of unequivocal, specific, and freely and intelligently given consent. It is true that "non-verbal conduct, considered with other factors, can constitute voluntary consent to search." *United States v. Gordon*, 173 F.3d 761, 766 (10th Cir.), *cert. denied*, —— U.S. ——, 120 S.Ct. 205, 145 L.Ed.2d 172 (1999). The court, however, is not satisfied that the government has proved such implied consent was given without duress or coercion considering the deceptive statement made about the positive dog alert. In these circumstances, the court finds that Cabrera's silence and lack of resistance in response to Britain's apparent directives to be mere acquiescence to a show of lawful authority and not the voluntary consent needed to justify the officers' warrantless search.

The evidence shows the officers continued to conduct themselves in a manner that conveyed their lawful authority to learn whether the package contained any contraband regardless of Cabrera's interests. Without asking permission or saying anything, Inspector Britain took the package from Cabrera just before the actual contents were revealed. He looked through the sack himself and set it down on the table away from Cabrera. Other officers looked through the sack and eventually took it to their vehicles for a closer inspection. They opened the bottles and smelled the contents. The officers exercised this authority over the package and never once asked for the defendant's consent. That the defendant did not voice any objection to their actions is not surprising in light of the officers' earlier and ongoing display of lawful authority to discover whether the package contained contraband.

██ Taking into account all of the circumstances—exercising control over the

---

**2.** "[A]lthough law enforcement officials are not required to inform criminal suspects of their right to refuse consent to search, 'knowledge of the right to refuse consent is one

factor to be taken into account.'" *United States v. Worley*, 193 F.3d 380, 386–87 (6th Cir.1999) (quoting *Schneckloth*, 412 U.S. at 227, 93 S.Ct. 2041).

package, the imperative wording, their number and proximity, repeated questioning about the package, and prohibiting the defendant from entering his own house without an officer—the police conduct here would have communicated to a reasonable person that he was not at liberty to ignore the officers and go about his business. *See United States v. Hill*, 199 F.3d 1143, 1147 (10th Cir.1999), *petition for cert. filed*, (Apr. 19, 2000) (No. 99–9245). The court does not believe the officers explained to Cabrera that his movement was restricted for purposes of officer safety and that he was free to end the encounter anytime and go about as he pleased. The totality of these circumstances gave the defendant an objective reason to believe he was not free to end the conversation with officers and proceed on his way. *United States v. Hernandez*, 93 F.3d at 1498. The government did not come forth with evidence showing that the officers had reasonable suspicion to detain Cabrera. As the defendant had reasonably explained most of the circumstances to Britain's satisfaction, only Cabrera's nervousness remained as a factor. Indeed, Inspector Britain's testimony cited in the above findings demonstrate they found no evidence of narcotics and had nothing but Cabrera's nervousness. Nervousness alone is not sufficient to sustain reasonable suspicion, but it is relevant and may contribute to a reasonable suspicion. *United States v. Soto–Cervantes*, 138 F.3d 1319, 1324 (10th Cir.), *cert. denied*, 525 U.S. 853, 119 S.Ct. 131, 142 L.Ed.2d 106 (1998); *see United States v. Ozbirn*, 189 F.3d 1194, 1200 (10th Cir.1999). Inspector Britain's testimony does not sustain any finding of reasonable suspicion.

■ When a detention was unlawful, "evidence obtained as a result of that illegal detention must be excluded to the extent it was fruit of the poisonous tree." *United States v. Miller*, 84 F.3d 1244, 1250 (10th Cir.), *cert. denied*, 519 U.S. 985, 117 S.Ct. 443, 136 L.Ed.2d 339 (1996). In short, the government must not only "show consent is voluntary in fact, but it must also demonstrate a break in the causal connection between the illegality and the consent, so that the court will be satisfied that the consent was 'sufficiently an act of free will to purge the primary taint.'" *United States v. Melendez–Garcia*, 28 F.3d 1046, 1054 (10th Cir.1994) (quoting *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)); *see United States v. Davis*, 197 F.3d 1048, 1052 (10th Cir.1999). In determining whether the illegal detention taints the defendant's consent to search, the court looks to the following rules:

"A search preceded by a Fourth Amendment violation remains valid if the consent to search was voluntary in fact under the totality of circumstances." *United States v. Fernandez*, 18 F.3d 874, 881 (10th Cir.1994); (citation omitted). "The government bears the burden of proving the voluntariness of consent, and that burden is heavier when consent is given after an illegal [detention]." *Fernandez*, 18 F.3d at 881 (citations omitted); (citation omitted). The government must demonstrate that Mr. McSwain's consent to search is "sufficiently an act of free will to purge the primary taint of the illegal [detention]." (footnote omitted); *United States v. Maez*, 872 F.2d 1444, 1453 (10th Cir. 1989); (citations omitted). No single fact is dispositive under the totality of the circumstances test, (citation omitted), but the three factors articulated in *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), are especially relevant: "the temporal proximity of the illegal detention and the consent, any intervening circumstances, and, particularly, the purpose and flagrancy of the officer's unlawful conduct." [*United States v.*] *Walker*, 933 F.2d [812] at 818 [(10th Cir.1991)] (citations omitted).

*United States v. McSwain*, 29 F.3d 558, 562 (10th Cir.1994); *see United States v. Gregory*, 79 F.3d 973, 979 (10th Cir.1996).

The government has not carried its heavier burden of proving that Cabrera voluntarily consented to the seizure of his package while he was being unlawfully detained. There are no facts· or circumstances from which to infer that Cabrera's

consent is sufficiently an act of free will to purge the primary taint of the illegal detention.

 Even if the evidence did show the taint here to be purged, the court would still conclude that Cabrera's permission to take the package was not consent but a mere acquiescence to a claim of lawful authority. This claim of lawful authority was created in part by Inspector Britain's statement that they would get a warrant if Cabrera did not consent. The Tenth Circuit recently summarized the relevant law in an unpublished decision:

[W]here some basis exists to support an application for a search warrant, an officer's express intention to seek a search warrant in the absence of consent does not render a consent involuntary. *See, e.g., United States v. Tompkins,* 130 F.3d 117, 122 (5th Cir.1997) (officer's statement that "he would obtain" a search warrant if defendant refused to consent was but one factor to be considered among the totality of the circumstances); *United States v. White,* 979 F.2d 539, 542 (7th Cir.1992) (where officer's expressed intention to obtain a search warrant was genuine and not merely a pretext to induce submission, such intention did not vitiate consent); *see generally United States v. Salvo,* 133 F.3d 943, 945 (6th Cir.1998) [, *cert. denied,* 523 U.S. 1122, 118 S.Ct. 1805, 140 L.Ed.2d 943 (1998) ].

*United States v. Creech,* 221 F.3d 1353, 2000 WL 1014868, at *2 (10th Cir. Jul.24, 2000) (Table); *see also United States v. Watson,* 117 F.3d 1421, 1997 WL 377035, *3 (6th Cir.) (Table) ("Notifying a person that a warrant can be obtained does not render consent involuntary unless the threat to obtain the warrant is baseless."), *cert. denied,* 522 U.S. 961, 118 S.Ct. 393, 139 L.Ed.2d 307 (1997). Thus, a court may find consent to have been vitiated where there was no probable cause for a search warrant and the officers knew the same but misrepresented that a warrant could be obtained and allowed the defendant to rely this misrepresentation in de-

ciding to consent. *See United States v. Vasquez,* 638 F.2d 507, 529 (2nd Cir.1980), *cert. denied,* 450 U.S. 970, 101 S.Ct. 1490, 67 L.Ed.2d 620 (1981). The testimony of Inspector Britain establishes that he knew they lacked probable cause to obtain a search warrant and that they intended just to leave the package with Cabrera if he did not consent to the seizure. The timing of Britain's misrepresentation and Cabrera's consent indicates Cabrera may have relied on this misrepresentation. Under these circumstances, the court finds that Inspector Britain's misrepresentation vitiated any voluntary consent which Cabrera could have given.

## MOTION FOR BILL OF PARTICULARS

### Arguments

The defendant seeks an order directing the government to provide a bill of particulars that specifies "[t]he exact manner, ..., in which defendant 'knowingly and intentionally' possessed 'with intent to distribute and dispense one (1) gram or more of a mixture or substance containing a detectable amount of' LSD." (Dk.19, p. 1). The defendant contends the narrative report of Inspector Britain, which is the only narrative report that the government has provided the defendant in discovery, does not afford an adequate basis for "discern[ing] what acts on the part of Cabrera the government believes constitute possession." (Dk.20, p. 3).

### Law and Analysis

 An indictment is held only to minimal constitutional standards, and the sufficiency of an indictment is judged "by practical rather than technical considerations." *United States v. Dashney,* 117 F.3d 1197, 1205 (10th Cir.1997). "An indictment is sufficient 'if it contains the elements of the offense charged, putting the defendant on fair notice of the charge against which he must defend and if it enables a defendant to assert an acquittal or conviction in order to prevent being placed in jeopardy twice for the same offense.'" *United States v. Poole,* 929 F.2d 1476, 1479 (10th Cir.1991) (quoting *United*

*States v. Staggs,* 881 F.2d 1527, 1530 (10th Cir.1989), *cert. denied,* 493 U.S. 1020, 110 S.Ct. 719, 107 L.Ed.2d 739 (1990)). In the Tenth Circuit, it is usually enough for the indictment to track the statute when the statute adequately expresses all of the elements to the offense. *United States v. Dunn,* 841 F.2d 1026, 1029 (10th Cir.1988).

The indictment here adequately apprises the defendant of the crime charged. The indictment quotes the essential elements of 21 U.S.C. § 841(a)(1) and alleges the specific date of possession, describes the general location of the possession as within the District of Kansas, identifies the specific controlled substance possessed, and alleges the amount of the controlled substance possessed. As far as learning which theory the government will use to prove possession, this is not a valid ground for seeking a bill of particulars. *United States v. Gabriel,* 715 F.2d 1447, 1449 (10th Cir.1983). The defendant's request for a bill of particulars is denied.

IT IS THEREFORE ORDERED that the defendant Cabrera's Motion to Suppress (Dk.17) is granted;

IT IS FURTHER ORDERED that the defendant's motion for bill of particulars (Dk.19) is denied.